952 P.2d 304

**STATE of Arizona, Appellee,**

v.

**Robert J. ACINELLI, Appellant.**

**No. 1 CA–CR 96–0541.**

Court of Appeals of Arizona,
Division 1, Department B.

July 24, 1997.

Review Denied March 17, 1998.*

* Feldman, J., of the Supreme Court, voted to grant review.

Dean W. Trebesch, Maricopa County Public Defender by Anna M. Unterberger, Deputy Public Defender, Phoenix, for Appellant.

## OPINION

EHRLICH, Judge.

Robert J. Acinelli ("defendant") appeals from his conviction and sentence for possession of a dangerous drug (methamphetamine), a class 4 felony. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Officer Deloy Hansen of the Arizona Department of Public Safety ("DPS") was patrolling Interstate 10 west of Phoenix on June 21, 1993, when he received an "attempt to locate" radio broadcast advising him that a man driving westbound in a white Thunderbird car with a California license plate was possibly carrying drugs. Twenty to thirty minutes later, Officer Hansen saw a car matching that description. He watched the driver make two unsignalled lane changes and stopped him. The driver later was identified as the defendant. After determining that the defendant's license and registration were valid, Officer Hansen returned the documents and explained to the defendant that the citations being issued were warnings which did not require the defendant to appear in court or pay a fine. The defendant was free to leave at that time.

Officer Hansen turned away from the defendant's car and walked toward his patrol car. He then stopped, turned to the defendant and asked him whether he was carrying any "guns, bombs, drugs, knives or anything in the car that is not supposed to be there." When the defendant replied "no," the officer asked if he could look in the car. The defendant said that he did not care and Officer Hansen presented him with a consent-to-search form, which the defendant reviewed and signed. While the officer searched the car, the defendant accepted Officer Hansen's offer to sit in the air-conditioned patrol car, with the door open, rather than remain outside in the heat.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Galen H. Wilkes, Assistant Attorney General, Phoenix, for Appellee.

In a knapsack on the floor of the front passenger area, Officer Hansen found a glass pipe and a small but usable quantity of methamphetamine, and he arrested the defendant. DPS Officer Brian LeDuc also searched the defendant's vehicle at the scene; he found approximately one ounce of methamphetamine in the pocket of a shirt hanging in the rear passenger compartment.

In a post-arrest interview, the defendant told officers that he had found the knapsack on the side of the road and that the methamphetamine in the shirt pocket was from the knapsack. In a later interview, however, he admitted that the knapsack was his and stated that he had purchased the methamphetamine for $10 or $20 from a man named "Joe" whom he had met at a restaurant.

The defendant was tried on one count of possession of a dangerous drug for sale. He testified that the knapsack was his, that he had loaned it to an acquaintance who had returned it shortly before the defendant was arrested and that he was unaware that it contained any drugs. He added that the shirt did not belong to him and that there was no shirt hanging in the car when he was stopped. The defendant contended that the officers had planted the methamphetamine in his car at the time of the search to coerce him into cooperating in a drug investigation and that he had lied about the origins of the methamphetamine in his post-arrest interviews because he had "panicked."

The defendant was convicted on the lesser-included offense of possession of a dangerous drug and he was sentenced to four years probation. He appealed, raising the following issues:

1. Whether his trial occurred within the time limits of ARIZ. R.CRIM. P. 8;

2. Whether the search of his car was reasonable; and

3. Whether the trial court acted within its discretion in denying his motion to order the prosecutor to review the personnel files of police witnesses.

## DISCUSSION

### A. Rule 8

The defendant was arrested on June 21, 1993. He spent a night in jail and was released to return to his home in Whittier, California. On December 16, 1994, the defendant was indicted and an arrest warrant was issued.

The DPS officers assigned to the case unsuccessfully attempted to contact the defendant by telephone, and they twice contacted the Whittier police and asked them to execute the warrant since they lacked jurisdiction to execute the warrant in California. When these efforts failed, the officers transferred the execution of the warrant to the DPS fugitive detail. A DPS officer contacted a detective in the Los Angeles County Sheriff's Department and telefaxed the warrant to him. He also followed up with several additional telephone calls and telefaxed a copy of the warrant a second time. The warrant was never executed but the defendant surrendered on June 30, 1995. He then moved to dismiss the case on the basis that the state had failed to exercise due diligence in serving a warrant or summons and therefore exceeded the 150–day time limit set forth in ARIZ. R.CRIM. P. ("Rule") 8.2. That rule provides:

(a) Every person against whom an indictment, information or complaint is filed shall be tried by the court having jurisdiction of the offense within 150 days of the arrest or service of summons under Rule 3.1 except for those excluded periods set forth in Rule 8.4 below.

An evidentiary hearing was held, centered on the state's efforts to execute the warrant. The trial court denied the motion, finding that the state had exercised due diligence in its attempts to execute the warrant and excluding time on that basis.[1]

---

1. We reject the state's contention that this argument is moot because the defendant failed to raise the denial of the motion in a special action. Although this court has granted special action review of Rule 8 challenges, it has never held that a special action is the exclusive avenue of relief. To the contrary, the supreme court has expressly rejected the contention that a defendant waives a Rule 8 time-limit claim by failing to bring a special action, State v. Tucker, 133 Ariz. 304, 306, 651 P.2d 359, 361 (1982), and appellate courts often have addressed Rule 8

In fact, there was no necessity for a hearing because there was no *prima facie* violation of the Rule 8.2(a) time limits. The defendant erroneously asserted and the prosecutor and the trial court mistakenly accepted the premise that the 150–day time limit began to run when the indictment was issued. The rule, however, plainly states that a defendant must be tried within 150 days of the arrest or service of summons. *See State v. Roberson,* 118 Ariz. 343, 344, 576 P.2d 531, 532 (App.1978) ("The difference between the old and the new rule is that computation of the 150 days under the new rule commences when the defendant is actually arrested or served with the summons, whereas, under the old rule, the 150–day period was computed from the date of issuance of a warrant or summons."). The defendant's right to a speedy trial "attaches when the defendant is held to answer" for the crime. *State v. Medina,* 190 Ariz. 418, 421, 949 P.2d 507, 511 (App.1997).

In this case, the 150–day period began to run on June 30, 1995, when the defendant surrendered. However, because he initially appeared and was released also on June 30, under Rule 8.2(c), the applicable time period became 120 days from that date. This period had not yet run when the defendant filed his motion to dismiss on October 17, 1995.

In any event, the defendant's claim would fail under the due-diligence analysis. This court will not disturb the trial court's refusal to dismiss the indictment if there is "any reasonable evidence" to support the conclusion that law-enforcement officers exercised due diligence in their efforts to arrest the defendant. *Humble v. Superior Court,* 179 Ariz. 409, 414, 880 P.2d 629, 634 (App. 1993). The DPS efforts satisfied the requirement that the state take "reasonable steps to locate the accused based upon all of the information that it possessed." *Id.* at 413, 880 P.2d at 633, quoting *State v. Armstrong,* 160 Ariz. 159, 160, 771 P.2d 889, 890 (App. 1989).

### B. Motion to Suppress

The defendant moved to suppress the evidence the DPS officers obtained during their search of his car, arguing (1) that his detention amounted to an unlawful arrest from the time Officer Hansen asked whether he was carrying any illegal drugs, (2) that his consent to the search of his car was involuntary, and (3) that his inculpatory statements and the evidence recovered from the car were fruits of the poisonous tree. The trial court denied the motion. The defendant urges the same grounds on appeal. We review for a clear abuse of discretion the court's denial of the motion. *State v. Atwood,* 171 Ariz. 576, 603, 832 P.2d 593, 620 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). We find no error.

### 1. The Detention as an "Arrest"

Whether a defendant has been arrested "turns upon an evaluation of all the surrounding circumstances to determine whether a reasonable person, innocent of any crime, would reasonably believe that he was being arrested." *State v. Winegar,* 147 Ariz. 440, 448, 711 P.2d 579, 587 (1985). Significant factors in the analysis include the officer's display of authority, the extent to which the defendant's freedom was curtailed, and the degree and manner of force used. *State v. Ault,* 150 Ariz. 459, 464, 724 P.2d 545, 550 (1986).

Here, the defendant was manifestly free to leave before Officer Hansen asked him whether he was carrying any "guns, bombs, drugs, knives or anything in the car that is not supposed to be there." When the defendant responded to that question in the negative, the officer "asked him if he minded if [he] checked in his vehicle and he said he didn't mind." There was never a show of force. Officer Hansen did not raise his voice, issue any commands or draw his gun. Instead, he told the defendant that he could sit

---

claims in the context of a direct appeal. *E.g., State v. Guerrero,* 159 Ariz. 568, 569–71, 769 P.2d 1014, 1015–17 (1989); *Tucker,* 133 Ariz. at 307–09, 651 P.2d at 362–64; *State v. Sanchez,* 155 Ariz. 544, 545–47, 747 P.2d 1243, 1244–46 (App. 1987); *State v. Roberson,* 118 Ariz. 343, 344–45, 576 P.2d 531, 532–33 (App.1978).

in the patrol car with the air conditioner running "if he wanted to" and he left the back door of the patrol car open because it locks automatically when it is closed.

Although Officer Hansen was couched with authority by wearing his uniform and driving a marked patrol car, he exercised that authority only to cite the defendant for traffic violations. He then returned the defendant's driver's license and car registration and began to walk away. A reasonable person would have felt free to leave at that point. When Officer Hansen resumed a dialogue with the defendant, he asked permission to search the defendant's car. The defendant agreed orally and in writing. The officer's questions would not have led a reasonable person to conclude that he was compelled by physical force or authority of law to stay. There was no *de facto* arrest.

### 2. Consent to Search the Automobile

■ The defendant argues that he was "not free to refuse consent" to search his car simply because Officer Hansen asked to search it without initially informing him that he could refuse consent. This argument is factually and legally specious.

There is no authority for the proposition that a search is non-consensual because an officer asks permission to conduct it. Countless decisions have upheld automobile searches upon a finding that the defendant voluntarily consented to the search after a uniformed officer asked permission. *E.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973) ("It is ... settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); *State v. Laughter,* 128 Ariz. 264, 266–67, 625 P.2d 327, 329–30 (App.1980) (same).

■ A trial court determines the voluntariness of a defendant's consent to search by examining the totality of the circumstances. *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59; *State v. Paredes,* 167 Ariz. 609, 612, 810 P.2d 607, 610 (App.1991). Whether a defendant knew that he had a right to refuse the request to search is but one factor to be taken into account. *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59.

■ The defendant signed the consent-to-search form prior to the search. The form expressly states that the signatory has been "duly advised of my constitutional rights (1) to refuse such consent, ... and (5) that I may withdraw my consent to search at any time prior to its conclusion." Thus, even if Officer Hansen had a duty to advise the defendant of his right to refuse consent, as the defendant argues, that duty was fulfilled.

### 3. "Fruit of the Poisonous Tree"

The defendant argues that the trial court erred in refusing to suppress the evidence recovered from his car and his post-arrest statements because they were "not sufficiently attenuated from the taint of the illegal arrest." Because we have rejected the premise of this argument that the defendant was illegally arrested, there is no foundation for this contention.

### C. Disclosure of Personnel Records

The defendant speculated that the officers focused on him as a means to gather evidence against an acquaintance of the defendant and the alleged subject of an ongoing narcotics investigation. In accordance with his theory, the defendant sought to prove that Officers Hansen and LeDuc "planted" drugs in his car which they pretended to have discovered during their searches. The defendant moved to compel disclosure of the DPS personnel records of the two officers to learn whether they had been disciplined for similar conduct in other cases in order to cast doubt on their credibility. The motion did not allege any facts or evidence to suggest that the files would contain impeachment evidence; rather, it rested on the premise that the prosecutor had an affirmative duty to review the DPS personnel files of Officers Hansen and LeDuc to determine whether the files contained any exculpatory information. The defendant argued that disclosure of the personnel files was required pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), relying on inter-

pretations of *Brady* set forth in *United States v. Henthorn,* 931 F.2d 29 (9th Cir. 1991), *cert. denied,* 503 U.S. 972, 112 S.Ct. 1588, 118 L.Ed.2d 306 (1992). The trial court denied the defendant's motion and he claims error.

There is a split of authority among federal courts regarding a prosecutor's duty, if any, under *Brady,* to review personnel records of material state law-enforcement witnesses in search of exculpatory material. In *Henthorn,* the Ninth Circuit imposed an affirmative duty on a prosecutor to examine such files upon a defendant's request to do so, without requiring the defendant to make an initial showing of materiality. 931 F.2d at 30–31. However, other federal courts have declined to require review of personnel records absent a threshold showing of materiality by the defendant. *United States v. Lafayette,* 983 F.2d 1102, 1106 (D.C.Cir.1993); *United States v. Driscoll,* 970 F.2d 1472, 1482 (6th Cir.1992), *cert. denied,* 506 U.S. 1083, 113 S.Ct. 1056, 122 L.Ed.2d 362 (1993); *United States v. Andrus,* 775 F.2d 825, 843 (7th Cir.1985). Division Two of this court recently addressed this issue and adopted the approach taken in *Driscoll. State v. Robles,* 182 Ariz. 268, 272, 895 P.2d 1031, 1035 (App.1995). We, too, find that approach to be better reasoned and consistent with the state's duty of disclosure under *Brady.* We agree with the following passage from *United States v. Navarro,* 737 F.2d 625, 631 (7th Cir.), *cert. denied,* 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984):

> Mere speculation that a government file may contain *Brady* material is not sufficient to require a remand for *in camera* inspection, much less reversal for a new trial. A due process standard which is satisfied by mere speculation would convert *Brady* into a discovery device and impose an undue burden upon the district court.

The defendant argues that he has made a showing of materiality by virtue of the defense theory and the importance of Officers Hansen's and LeDuc's testimony. He cannot, however, distinguish this case from cases such as *Driscoll* merely by claiming the efficacy of impeaching the officers.

There, too, the defendants sought to cast doubt on the credibility of the state's most important witnesses. Impeachment evidence is relevant and admissible but "materiality" for these purposes is a showing that a personnel file "contain[s] material evidence." 970 F.2d at 1482. In this case, the defendant, like the defendant in *Andrus,* sought review of personnel files "without even a hint that impeaching material was contained therein." 775 F.2d at 843. He was effectively requesting a "blind fishing expedition among documents possessed by the government." *Jencks v. United States,* 353 U.S. 657, 667, 77 S.Ct. 1007, 1012–13, 1 L.Ed.2d 1103 (1957). Under these circumstances, the defendant failed to demonstrate materiality and the trial court was within its discretion in denying his motion to compel review of the personnel files.

### CONCLUSION

For the foregoing reasons, we affirm the defendant's conviction and sentence.

NOYES, P.J., and GERBER, J., concur.